IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONALDA MESON                          :

                                       :

    v.                               : Civil Action No. DKC 2004-3806

                                       :

GATX TECHNOLOGY SERVICES
CORPORATION, et al.                    :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this breach of contract employment case is the motion of Defendants GATX Technology Services Corporation ("GTS") and GATX Financial Services Corporation (collectively, "Defendants") for summary judgment pursuant to Fed.R.Civ.P. 56.  (Paper 33).  The issues are briefed fully and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the motion for summary judgment will be granted in part and denied in part.

## I.  Background

The following facts are undisputed unless noted.  Plaintiff Ronalda Meson ("Meson") has worked as a sales representative and manager in the commercial information technology ("IT") leasing industry for more than twenty years.  In 2000, Meson was employed as a sales manager and representative by El Camino Resources, Ltd. ("El Camino"), a leasing company.  After El Camino ran into

financial trouble, GTS bought El Camino's lease portfolio.[1]  At the time, Meson discussed with a GTS representative her concern that she would lose her commissions on the leases she originated.[2]  GTS offered Meson a position, and she began her employment at GTS in 2001 as a manager and sales representative.  In April 2004, GTS announced it was selling its IT leasing business to CIT Systems ("CIT").  Meson attempted to obtain a job with CIT, but the company did not offer her a position.  The GTS-CIT asset sale closed on June 30, 2004, and Meson's employment with GTS ended on that day.

    While working for GTS, Meson was entitled to receive three categories of compensation: (1) a base salary; (2) management compensation based on her supervision of other sales representatives; and (3) commissions for her work as a sales representative.  As a sales representative, she had the opportunity to earn two types of commissions: (A) an origination commission that generally was equal to 1% of the original equipment cost and (B) a "Gross Margin" commission that came later in the lease process when GTS earned a margin or profit on the lease.  Her

---

[1] GTS is a subsidiary of GATX Financial Services Corporation.

[2] Meson believed, however, that if she became employed by GTS, which was buying El Camino's portfolio of leases and equipment, she would be able to earn her commissions from GTS.

claims in the present lawsuit are based on her management compensation and commissions as a sales representative.[3]

The parties disagree as to what written documents established Meson's rights to compensation. In an Agreement dated January 26, 2001, GTS confirmed its offer of employment as a Regional Sales Manager and outlined certain terms. The Agreement stated:

> You will participate in GATX Technology Services commission plan, known as the Direct End user Plan. A copy of the 2000 plan will be forwarded to you for your review. There will be a newly drawn plan for 2001 which will incorporate enhancements including a feature that provides an up front component that advances commission dollars for originating FMV lease transactions. The up front component will be an amount equal to 1% of OEC. Any commissions paid for originations are considered equity invested in the transaction and, like equity, is grown at a rate that provides GATX with a return on its investment. Any back end participation occurs only after GATX has recouped all of its equity investment (including any commission payments), any expenses, plus its return on investment. The commissions rate used for profits or losses on portfolio transactions will be 25%. The commission rate for 2001 will be 25%. GTS does not assume responsibility for monies owed to you by El Camino.

---

[3] GTS asserts that Meson does not seek compensation relating to her work as a regional sales manager. (Paper 33, at 4). The complaint, however, states that "GTS has refused to pay plaintiff the amount of compensation due to plaintiff for work performed prior to June 30, 2004, specifically short-paying plaintiff in her manager compensation in the amount of approximately $269,000 for the current year, and, taking into account the three year residuals of manager compensation, approximately $700,000, discounted . . . ." (Paper 1, at ¶ 16).

(Paper 34, ex. A, ¶ 4).   The Agreement included a section for Meson's signature to indicate acceptance of the offer.   Meson signed the letter March 12, 2001.  Meson believes the Agreement is the primary source of her right to payment.

GTS contends that the only written documents that determine her compensation are the commission plans.   Several commission plans were issued during Meson's tenure.[4]   The 2001 commission plan, which was in effect during 2001 and 2002, provided in pertinent part:

> There are four (4) types of commissionable
> events: Leases, Terminations, Sales and
> Adjustments.   The following is a description
> of how each of these events happen and when
> such is given Gross Margin credit.

The 2003 and 2004 plan commission plans also contain a list of commissionable events:

> Commissions    are   paid   based   upon   the
> profitability  of  a  lease  transaction  as
> measured by the Gross Margin received by the
> Company  [(GTS)]  over  the  full  life  of  the
> lease.   The Company will pay commissions on
> the following types of sales activity: (i) the
> origination  of  a  lease  transaction  ("Lease
> Origination"),  (ii)  the  conclusion  of  a
> transaction   that   generates   Gross   Margin
> ("Gross  Margin")  and  (iii)  the  funding  of  a
> lease transaction with a new customer ("New
> Account").   The specific requirements for each
> of the above are outlined below.

---

[4] The plans are similar with respect to terms but use different language.  Neither party has argued that any differences among the plans are significant for purposes of the present motion for summary judgment.

. . .

Gross Margin - The Company will pay a commission for transactions that generate Gross Margin (as defined herein). Sales activity that can earn a commission for Gross Margin include the following:

(i) initiation of a lease which provides the lessee with the option to purchase the equipment for a nominal sum (a "Dollar Option Lease");

(ii) completion of a remarketing event which may occur during the lease term or upon expiration of the lease term ("Remarketing Events");

(iii) completion of a buy/sell transaction, which generates a Gross Margin for the Company ("Buy/Sell"); and

(iv) completion of transactions that generate fees for the Company ("Fee Income").

The 2004 plan further defines remarketing transactions:

Remarketing Events - Gross Margin commissions for a FMV lease transaction cannot generally be determined until lease termination or upon the occurrence of a Remarketing Event. A Remarketing Event shall be deemed to have occurred when Gross Margin from the transaction can be recognized as income (unless specified otherwise). Remarketing Events can occur in the following forms. A combination of these activities may occur in a single lease termination.

(i) Purchase - Leased Equipment is purchased by the customer during the term of the lease, at end of lease, following Month to Month ("MTM") extensions or other renewal periods;

(ii) MTM Extensions - Leases that reach end of term and are then extended on a Month to Month basis. Month to Month rentals are recognized for commission purposes at such time as the Company actually receives payment;

(iii) Extension - Leases that are extended by entering into an additional firm lease;

(iv) Renewal - Leases that are renewed for a fixed period of time at a negotiated rate;

(v) Termination - Leases that are terminated by the customer providing proper notice to the Company.  The Equipment is purchased by the customer and/or returned and sold by Sales or Portfolio Management.

(vi) Early Termination - Leases that are early terminated by the customer by exercising rights available in the lease or with the consent of the Company.  The Equipment is purchased by the customer and/or returned and sold by Sales or Portfolio Management.

(vii) Rewrite - Leases that are terminated early in order to rewrite the lease over a longer term.  This is frequently a result of the customer's desire to upgrade the equipment or add additional equipment.

(viii) Returned Equipment Sales – Sales of off-lease equipment returned to the Company or a remarketing partner shall be recognized for commission purposes at such time as the Company actually receives payment.

(Paper 33, ex. A, attach. 6, 7).[5]   The 2003 and 2004 commission plans also provide that "[e]xcept as provided by Section 3 (Retirement, Death or Disability) in order to receive payment a Participant must be employed by the Company on the date such commissions become payable.   All commissions are payable upon booking of the transaction into the Company's lease management system. . . . Resignation or termination will also result in the forfeiture of any further commissions as of the last date of employment." *Id.*

Meson filed her complaint on December 2, 2004, containing the following claims: Count I, breach of contract, for failing to pay all of the compensation due to her; Count II, violation of the Maryland Wage and Hour Law, Md. Code. Ann., Lab. & Empl., § 3-505 and 3-507.1; Count III, refusal to pay severance; Count IV, violation of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*; Count V, breach of contract, for her work on an existing lease portfolio that she worked on even though she did not manage the account; Count VI, unjust enrichment; and Count VII, promissory estoppel.   GTS has filed a motion for summary judgment on all counts.   (Paper 33). Meson consents to the dismissal of Counts V, VI, and VII (paper 34, at 1 n.1).

_____

[5] The language in the 2003 and 2004 plans is slightly different.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential

element . . . necessarily renders all other facts immaterial."
*Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the
nonmoving party will have the burden of proof, it is his or her
responsibility to confront the motion for summary judgment with an
affidavit or other similar evidence in order to show the existence
of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256;
*Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of
evidence in support of the nonmovant's position will not defeat a
motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d
529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must
be "sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party. If the evidence is merely
colorable, or is not significantly probative, summary judgment may
be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. Analysis

### A.    Choice of Law

In their memorandum in support of their motion for summary
judgment, Defendants state that either Maryland or Florida law
applies but that "[n]o choice-of-law issue is presented, however,
as Florida and Maryland law are identical on the contract and
employment law principles cited in this brief."  (Paper 33, at 7
n.1).  In her opposition memorandum, Meson agrees there is no
difference between Maryland and Florida law on the relevant

issues.[6]  (Paper 34, at 8 n.8).   In their reply brief, Defendants assert that Florida, not Maryland, law should control the resolution of the dispute with respect to paying commissions after Meson's termination, if there is a material difference between Maryland and Florida law.  (Paper 35, at 5 n.3).

Because this is a diversity case, the court applies Maryland law, including its choice of law provisions. *See* 28 U.S.C.A. § 1652; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Furthermore, "'[g]enerally, the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply.' *Miller v. Dorr*, 262 F.Supp.2d 1233, 1237 (D.Kan. 2003)." *See also Med James, Inc. v. Ins. Mktg. Solutions, Inc.*, No. 05-2209-KHV, 2006 WL 1360400, at *3 (D.Kan. May 17, 2006).

---

[6] Meson, however, cites to Florida law and asserts that, with respect to failure to pay commissions, Fla. Stat. Ann. § 686.201, Florida provides that when a company fails to pay "all commissions due within 30 days after termination," the company is liable for treble damages and reasonable attorneys even if there is a bona fide dispute.  (Paper 34, at 15).  This provision applies only where a contract is not reduced to writing. *See* Fla. Stat. Ann. § 686.201(3). *See also Rosenfeld v. Lu,* 766 F.Supp. 1131, 1136 (S.D.Fla. 1991)(stating that the statute applies where the manufacturer does not enter into a written contract).  Because Meson concedes that there is a written agreement, this section is inapplicable.

Maryland follows the law of *lex loci contractus*, which requires application of the substantive law of the place where the contract was made. *See Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 570 (1995)(stating that "the construction and validity of a contract [is] determined by the law of the place of making of the contract").  The contract is "made" where the last act necessary for its formation is performed. *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md.App 476, 490 (2002).

The papers do not clearly show where the last act necessary to form the contract was performed.  Meson states in her deposition that she lives in Vienna, Virginia (paper 33, ex. A, at 6), and the Agreement that offered her employment with GTS was addressed to Meson in Vienna, Virginia.  (Paper 34, ex. A).  The Agreement, however, asked her to confirm acceptance of the offer by returning the letter by mail or by fax to GTS.  Thus, it is unclear whether the last act necessary was the signing of the Agreement in Virginia, or the receipt of that acceptance in Florida.  In addition, the terms of Meson's employment were determined by the commission plans, which were written in Florida.  Moreover, there is no evidence in the record indicating that she signed any paperwork in Maryland, performed any work in Maryland, or performed any other act that might be necessary to form the contract in Maryland.

11

Several courts have observed that: "[f]ailure to present facts sufficient to determine where the contract is made may justify a default to forum law.  *See SIG Arms Inc. v. Employers Ins. of Wausau*, 122 F.Supp.2d 255, 258-59 (D.N.H. 2000); *Lobo Exploration Co. v. Amoco Production*, 991 P.2d 1048, 1051-52 (Okla.Civ.App. 1999), *cert. denied*, 529 U.S. 1124, 120 S.Ct. 1996, 146 L.Ed.2d 821 (2000); *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 204-05 (Tex. 2000)."  *Layne Christensen Co. v. Zurich Canada*, 30 Kan.App.2d 128, 143-144, 38 P.3d 757, 767 (Kan.App. 2002).  Thus, inasmuch as neither party has presented facts sufficient to justify applying any law other than Maryland's, Maryland law will be applied, even though it is likely that either Virginia or Florida law should apply.  The only issue that Defendants claim is controlled by Florida law is the issue of commissions owed after an employee was terminated.  The selection of Maryland law over Florida law would not change the outcome as to that issue.

## B.   Breach of Contract (Count I)

Meson claims she is entitled to additional commissions stemming from leases she originated because the Agreement promised her a 25% commission on GTS's profits on those leases.  On all of the leases, Meson insists she did all she was required and/or allowed to do, GTS profited from those leases through the sale of those leases to CIT, and this sale triggered her right to commissions.  (Paper 34, at 9).  Defendants argue that the plain

12

language of the commission plans identifies the circumstances under which sales employees are entitled to commissions, and the sale of substantially all of GTS's assets as part of the termination of its business is not an event that entitles Meson to commissions.

The interpretation of a contract, including the question of whether a contract is ambiguous, is a question of law. *See Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003). When determining the meaning of language in a contract, Maryland courts follow the principle of objective interpretation of contracts. *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250-51 (2001). Under this principle, if the language is unambiguous, "the court shall give effect to its plain meaning and there is no need for further construction by the court." *Id.*

> Further, "[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." [*Auction & Estate Representatives, Inc. v.*] *Ashton*, 354 Md. [333] at 340, 731 A.2d at 444 [(1999)](citing *Adloo*, 344 Md. at 266, 686 A.2d at 304; *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Board of Trustees v. Sherman*, 280 Md. 373, 380, 373 A.2d 626, 629 (1977)). *See also Beckenheimer's Inc. v. Alameda Assocs. Ltd. Partnership*, 327 Md. 536, 547, 611 A.2d 105, 110 (1992) ("A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean"). The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed. *Kasten Constr. Co. v. Rod Enters., Inc.*, 268 Md. 318, 329, 301 A.2d 12, 18 (1973); *Liller v. Logsdon*, 261

13

> Md. 367, 370, 275 A.2d 469, 470-71 (1971);
> *Belmont Clothes, Inc. v. Pleet*, 229 Md. 462,
> 467, 184 A.2d 731, 734 (1962); *ST Sys. Corp.*
> *v. Maryland Nat'l Bank*, 112 Md.App. 20, 34,
> 684 A.2d 32, 39 (1996).

*Id.* at 521.   Moreover, "the contract must be construed in its
entirety and, if reasonably possible, effect must be given to each
clause so that a court will not find an interpretation which casts
out or disregards a meaningful part of the language of the writing
unless no other course can be sensibly and reasonably followed."
*DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 320 (2003) (quoting *Sagner*
*v. Glenangus Farms, Inc.*, 234 Md. 156, 167 (1964)).

A contract is ambiguous "if, when read by a reasonably prudent
person, it is susceptible of more than one meaning."  *Calomiris v.*
*Woods*, 353 Md. 425, 436 (1999); *see also Heat & Power Corp. v. Air*
*Prods. & Chems., Inc.*, 320 Md. 584, 596 (1990)("An ambiguity exists
when, to a reasonably prudent person, the language used in the
contract is susceptible of more than one meaning.").   If the
contract is ambiguous, a court may refer to extrinsic evidence to
determine the intention of the parties.  *Kendall v. Nationwide Ins.*
*Co.*, 348 Md. 157, 170 (1997) ("If the language of the contract is
ambiguous, extrinsic evidence may be consulted to determine the
intention of the parties and whether the ambiguous language has a
trade usage.").

Defendants argue that, pursuant to the plain language of the
commission plans, the sale of substantially all of the assets of

GTS to CIT does not fall within the categories of commissionable events described in the commission plans, and that all of the commissionable events involve transactions in the ordinary course of business.[7]   (Paper 33, at 11).   Defendants also argue that Meson, an at-will employee, could be terminated at any time for any reason.   They insist that they do not owe Meson any more commissions because the commission plans provide (1) that a sales representative "must be employed by the Company on the date such commissions become payable" and (2) "resignation or termination will also result in the forfeiture of any further commissions as of the last date of employment."   (Paper 33, at 12).

Meson responds with alternative, somewhat inconsistent, arguments.   First, she asserts that the asset sale to CIT prevented her from performing her work on the leases, thereby violating the rule against preventing another's performance of a condition precedent. (Paper 34, at 8).   Alternatively, she argues that the language in the Agreement and commission plans can be interpreted in her favor because (1) the commission plans and the Agreement do not expressly exclude the sale of substantially all assets as a commissionable event and (2) there is nothing in the commission plans stating that the methods identified to earn a commission are

---

[7] Defendants assert that when GTS sold substantially all of its assets, Meson was not involved in the transaction, and they proffer an affidavit in support.   *See* paper 33, ex. C, McGreal aff., ¶ 5 (stating that Meson "was not involved in negotiating or consummating the sale transaction").

exclusive.  (Paper 34, at 10).  Relying on expert testimony, she argues that the terms "remarketing event" and "Buy/Sell" are terms of trade usage and that an asset sale can qualify as both a remarketing event and a Buy/Sell.  Finally, she responds to Defendants' argument that she did not have a vested right in additional commissions by stating that the provisions in the commission plans that require her to be employed on the date the commissions are payable are unenforceable pursuant to Maryland law. *Id*. at 13.

**1.   Right to Commissions Based on the Agreement**

Meson is not entitled to a 25% commission on profits earned by GTS based solely on the letter Agreement.  The Agreement expressly incorporates the terms of the commission plans by stating: "You will participate in GATX Technology Services commission plan, known as the Direct End user Plan."  The Agreement states that the plan will be sent to her and discusses in a general way the provisions in the plan.  Thus, there is no merit in Meson's assertion that the Agreement was the sole or primary source of her right to compensation and the fact that GTS earned profits on the leases she originated entitled her to commissions.

**a.   Prevention Doctrine**

Under the prevention doctrine, "if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused."  Richard

16

A. Lord, Williston on Contracts § 39:3 at 516 (2000).  Moreover, "[w]here a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform." *Id.* at 517-58.  *See also* Restatement (Second) of Contracts § 295 ("If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty . . . ." ).  Maryland courts have applied this doctrine in a few cases.[8]  For instance, in *Singer Constr. Co. v. Goldsborough*, 147 Md. 628, 638 (1925), a broker offered to procure a buyer for the seller's properties and the seller agreed.  The broker presented a buyer who was "ready, willing, and able to close the deal," but the seller refused to

---

[8]  The Florida courts also recognize this doctrine.  *See Knowles v. Henderson*, 22 So.2d 384, 386 (Fla. 1945)("It is a general principle of law, that he who himself prevents the happening or performance of a condition precedent, upon which his liability, by the terms of the contract, is made to depend, cannot avail himself of his own wrong and relieve himself from his responsibility to the obligee, and shall not avail himself, to avoid his liability, of a nonperformance of such precedent condition, which he has himself occasioned, against the consent of the obligee.")(quoting *Hart v. Pierce*, 125 So. 243 (Fla. 1929).

complete the sale, and instead sold the properties to another buyer.  The Court of Appeals stated:

> Where the agent has done all he undertook to do, and procured a buyer as contemplated, he may not be deprived of his right to remuneration by the circumstance that the sale has fallen through by the unwarranted refusal of the principal to enter into a contract to carry out the authorized sale according to its prescribed terms.  The principal's declination to complete the contract is a waiver of subsequent conditions whose fulfillment is made impossible by the principal's action.  Under such circumstances, the broker is entitled to recover compensation for his services.

Id. at 638.  *See also McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 226 (1944)(holding that the defendant owed commissions to the brokers because any failure to complete the deal was due to the defendant's fraud).

The prevention doctrine is inapplicable under the present facts if the sale of substantially all assets is not a commissionable event.  In both of the cases discussed above and cited by Meson, the plaintiffs had done everything possible and it was the principal's decision to not close the sale that prevented the plaintiffs from obtaining the commissions.[9]  *See Singer Constr.*

---

[9] Florida law is similar to Maryland law on this point.  *See Knowles v. Henderson*, 22 So.2d 384,385-86 (Fla. 1945)("[W]here a broker in good faith and in reliance upon his contract procures a purchaser ready, able and willing to buy the property in accordance with the terms fixed by the seller, and before the broker can effect the sale or procure a binding contract of purchase the seller defeats the transaction, not for any fault of the broker or purchaser but solely because the seller will not or cannot complete
(continued...)

*Co.*, 147 Md. at 638(stating that "the agent has done all he undertook to do, and procured a buyer as contemplated"); *McKeever*, 183 Md. at 226 (awarding commissions because the agents had done all that was required).  As will be discussed below, Meson did not do everything necessary in order to secure the commission; specifically, she did not arrange another commissionable event. She concedes this point by arguing that Defendants prevented her from performing a commissionable event:

> As a sales representative, Ms. Meson's obligation was to originate leases.  The Agreement promised her a 25% commission on GTS' profit on those leases.  The commission plans described various ways the profit could be achieved.  If GTS' argument is correct that none of these ways was achieved, that failure would be a result of GTS' unilateral decision to sell its assets, which cut off Ms. Meson's ability to achieve profit through the normal ways set out in the commission plans.

(Paper 34, at 9)(footnote omitted).  Defendants correctly respond that Meson "cannot argue that preventing her from *attempting to earn* commissions is the same as preventing her from *receiving* commission that she already earned by completing all the work necessary under the Plans."   (Paper 35, at 4-5) (emphasis in original).

---

[9](...continued)
the transaction, then and in such case the broker is entitled to his commission, if the customer remains ready, able and willing to purchase, although the sale has not been fully completed; the strict terms of the contract between principal and broker as to completing the sale or procuring a binding contract of purchase from the customer being deemed waived by the principal.").

**b.    Qualification of an Asset Sale as a Commissionable Event**

Meson contends, alternatively, that the asset sale was a commissionable event.  She argues that the commission plans do not expressly address whether an asset sale is a commissionable event, and therefore, the plain meaning rule does not apply.  She further states that "[f]or the plain meaning rule to apply, either the Agreement or the Commission Plan would have to say something to indicate that a sale of substantially all of GTS' assets excludes what would otherwise be commissionable from commission status." (Paper 34, at 10).  She contends that an asset sale can qualify as both a remarketing event and a buy/sell transaction.  (Paper 34, at 10-11).  With respect to the latter argument, she asserts that the term "Buy/Sell" is a term of art and that it can include the sale of substantially all assets, and she provides expert testimony in support.  (Paper 34, at 10-11).

Meson's arguments are unpersuasive.  First, although the commission plans do not expressly address an asset sale, they are very specific about what events do qualify as a commissionable event.  The commission plans list specific transactions under which GTS will pay a commission for Gross Margin: a Dollar Option Lease, a Remarketing Event, a Buy/Sell and a Fee Income.  An asset sale is not on this list of transactions. Similarly, "Remarketing Events" identifies a specific list of sales activities that qualify as a commissionable event.  Again, an asset sale is not on the list.

The court's role in interpreting a contract is to give meaning to the words actually written and not to words the parties might have included. *See Wells*, 363 Md. at 251 (stating that "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court"). Moreover, nothing in the language suggests that the list of commissionable events is non-exclusive, for instance by using the word "including." *See Group Health Assn, Inc. v. Blumenthal*, 295 Md. 104, 111 (1983)(stating that "the word 'including' means comprising by illustration and not by way of limitation").

Second, Meson asserts that the court may look to extrinsic evidence to determine the intention of the parties. With one exception that will be discussed below, the commission plans are unambiguous in their identification of circumstances under which a sales representative may earn a commission. Commissions are earned based on three specific sales activities: a Lease Origination, a Gross Margin, or a New Account. A Gross Margin involves the following activities: a Dollar Option Lease, a Remarketing Event, a Buy/Sell, and a Fee Income. The definition of a Remarketing Event identifies specific activities: a Purchase; a Month-to-Month Extension; an Extension; a Renewal; a Termination, an Early Termination, a Rewrite; or a Returned Equipment Sale. The sale of substantially all assets does not fit into any of these activities.

21

Thus, the plain language of the commission plans supports Defendants' position that an asset sale does not qualify as a remarketing event, and extrinsic evidence is not needed to resolve an ambiguity.

The only ambiguity involves the term Buy/Sell because the commission plans do not identify the types of activities that qualify as a Buy/Sell, and therefore, extrinsic evidence may be considered. Defendants assert that the term Buy/Sell involves the buying and selling of specific equipment, and not the buying and selling of substantially all of the company's assets. In support, Defendants point to a provision in the 2001 commission plan that explains the responsibilities of sales representatives. The plan states that sales representatives are responsible for initiating and developing client relationships and that the company wishes to provide the following services: "1) Equipment Leasing 2) Buy and Sell Equipment 3) Establish Strategic Alliance Programs." (Paper 33, ex. A, 2001 commission plan, at 5). In addition, GTS's strategic plan refers to Buy/Sell Gains as "[f]ee generated on purchase and resale of equipment." (Paper 33, ex. A, strategic plan, unnumbered page 4). Meson's expert testimony supports Defendants' view that Buy/Sell involves the selling of specific equipment. Her expert, Thomas B. Howard, Jr., states in a declaration that the term Buy/Sell is "used regularly in the industry, and it refers, among other things, *to the sale by a*

*leasing company of the equipment associated with a lease* to somebody other than the lessee." (Paper 34, Howard decl., ¶ 6)(emphasis added). The only other evidence Meson provides is an expert report prepared by Howard, in which he concludes that an asset sale is a remarketing event – but does not say that an asset sale is a Buy/Sell.[10] (Paper 34, ex. E, at 5). Thus, Defendants have presented uncontroverted evidence that Buy/Sell refers to the buying and selling of equipment, not the buying and selling of substantially all assets.

## 2.   Vested Interest

Meson contends that the Defendants cannot rely on the provision in the commission plans that requires an employee to be employed on the day commissions are payable because this provision is unenforceable under Maryland law. The case Meson cites, *Medex v. McCabe*, 372 Md. 28 (2002), however, does not apply to Meson's circumstances. In *Medex,* the plaintiff filed suit after his former employer refused to pay certain incentive fees on top of his base salary. The employer's manual stated that payment of the fees was conditional upon the employee being employed at the time of actual payment. *Id*. at 33. Although the fiscal year ended on January 31, 2000, incentive fees were not paid until March 31, 2000. The plaintiff resigned from his position in February 2000. The Court

---

[10] As discussed previously, a remarketing event is defined in the commission plan, and therefore, extrinsic evidence is not needed to help define a remarketing event.

of Appeals held that a provision that required an employee to be
employed by the company on the date certain incentive fees were
paid was unenforceable where the employee had performed all the
work necessary to earn the fees.  The court explained that "an
employee's right to compensation vests when the employee does
everything required to earn the wages." *Id*. at 41.  In the present
case, Meson's right to the commissions had not vested when she left
her position with GTS because she had not achieved a commissionable
event.  Thus, *Medex* is inapplicable to her claims for sales
commissions.[11]

Accordingly, the court will grant the Defendants' motion for
summary judgment with respect to the breach of contract claims for
commissions earned as a sales representative.  Meson also seeks
compensation relating to her work as a regional sales manager.
(Paper 33, at 4).  Because GTS has provided no argument addressing
Meson's management compensation, the court will deny the portion of
Defendants' motion that relates to Meson's claims for management
compensation.

## C.   Violation of the Wage Payment Act (Count II)

Meson claims that the Defendants violated the Maryland Wage
and Hour Law, Md. Code. Ann., Lab. & Empl., § 3-505 and § 3-507.1.
The law provides, *inter alia*, that an employer "shall pay an

---

[11] Because Meson's right to a commission has not vested, the
court need not address the issue of a bona fide dispute.

employee . . . all wages due for work that the employee performed
before the termination of the employment, on or before the day on
which the employee would have been paid the wages if the employment
had not been terminated." § 3-505.  The term "[e]mployer includes
any person who employs an individual in the State or a successor of
the person." § 3-501(b).

Because GTS did not employ Meson in Maryland – the evidence
demonstrates that GTS employed Meson in Virginia and there is no
evidence that Meson did any work for GTS in Maryland – GTS does not
meet the definition of an employer.  Meson, therefore, cannot
invoke the  Maryland Wage and Hour Law.[12]  Accordingly, the court
will grant Defendants' motion for summary judgment on Count II.

D.   **Refusal to Pay Severance (Count III)**

Meson alleges that GTS offered severance to its employees
under a formula of 30 weeks of base salary, an amount equal to
$72,115.38, and that she did not receive this severance pay because
she refused to sign a release waiving her right to seek the unpaid
commissions.  (Paper 1, ¶ 14).  Meson claims that GTS's refusal to
pay severance without a waiver of her rights violates public policy
because the waiver requires an employee to violate his or her
statutory rights in order to receive a payment available to all
employees.  (Paper 1, ¶ 23).

---

[12] Because the Maryland Wage and Hour Law is inapplicable, the
court need not address the portion of the arguments relating to a
bona fide dispute and § 3-507.1.

In their motion for summary judgment, Defendants assert that
GTS offered two levels of severance benefits to their employees:
(1) a base severance level and (2) an enhanced severance to
employees who signed releases.  (Paper 33, at 14).  Defendants
proffer the affidavit of Gail Duddy, a senior vice president, who
stated that "[b]ecause Meson did not sign a release, she received
the base severance amount.  She has been fully paid under the
severance plan."[13]  (Paper 33, ex. D).  Defendants also contend that
"[t]here is no principle of law that prevents GTS from offering a
greater amount of severance benefits to those employees who are
willing to agree not to sue GTS and force it to incur defense
costs."  *Id.*  In her opposition memorandum, Meson does not dispute
that she received the base level of severance.  Instead, she
objects to the fact that she did not receive the enhanced level of
pay because she did not sign the release, and argues that GTS may
not condition severance pay upon the release of the right to seek
those commissions to which she is entitled.[14]  (Paper 34, at 17-18).
In support, Meson cites *O'Brien v. Encotech Construction Services,*

---

[13] Neither party has presented any evidence relating to what
the waiver said or did or the circumstances under which Meson was
asked to sign a waiver.

[14] For this assertion, Meson relies on *Medex*, which quotes with
approval *O'Brien v. Encotech Construction Services, Inc.*, 183
F.Supp.2d 1047 (N.D.Ill. 2002).  *Medex*, however, does not quote
*O'Brien* on the issue of severance payments and releases of certain
claims, but for a different proposition: That an employee's right
to compensation vests when the employee does everything required to
earn the wages.  *See Medex*, 372 Md. at 41.

*Inc.*, 183 F.Supp.2d 1047 (N.D.Ill. 2002), in which a court held
that releases waiving an employer's liability under Illinois'
minimum wage and wage payment laws, in exchange for compensation,
were void because the releases undermined the goals of the Illinois
statute.[15]

As noted at the outset, Maryland law is applicable given the
parties' failure to establish that another forum's law should
apply.  Clearly, an Illinois federal court's decision, applying
Illinois law, is an unlikely source of Maryland law.  As noted by
the United States Court of Appeals for the Fourth Circuit:

> When a federal trial court sits in diversity,
> it is bound by applicable state substantive
> law. 28 U.S.C. § 1652; *Erie R.R. v. Tompkins*,
> 304 U.S. 64 (1938).  Although the judicial
> decisions of a state constitute the laws of
> that state as defined in the Judicial Decision
> Act, 28 U.S.C. § 1652, the decisions of its
> lower courts are not controlling in instances
> where the highest court of the state has not
> spoken on the point. *Commissioner v. Bosch*,
> 387 U.S. 456, 464-6 (1967).  Furthermore,
> although the decision of an intermediate
> appellate state court provides guidance in
> ascertaining state law, it must be disregarded
> if other persuasive authority suggests that
> the highest court of the state would decide
> otherwise. *Id.* at 465; *West v. A.T. & T.*, 311
> U.S. 237 (1940).

*Leonard v. Nationwide Mut. Ins. Co.*, 1995 WL 25876, *6 (4th Cir.
1995).  Moreover,

---

[15] Meson contends that Florida has a strong public policy on
this issue, by relying on Fla. Stats. Ann. § 686.201.  As noted
previously, § 686.201 is inapplicable.  *See supra* n.6.

> As a federal court sitting in diversity, we
> have an obligation to apply the jurisprudence
> of [the forum's] South Carolina's highest
> court, the South Carolina Supreme Court.
> *Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir.
> 1999); *Liberty Mut. Ins. Co. v. Triangle
> Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir.
> 1992).   But in a situation where the South
> Carolina Supreme Court has spoken neither
> directly nor indirectly on the particular
> issue before us, we are called upon to predict
> how that court would rule if presented with
> the issue.  *Id.*  In so predicting, the South
> Carolina Court of Appeals' decisions, as the
> state's     intermediate     appellate    court,
> "'constitute the next best indicia of what
> state law is,' although such decisions 'may be
> disregarded if the federal court is convinced
> by other persuasive data that the highest
> court of the state would decide otherwise.' "
> *Liberty Mut. Ins. Co.*, 957 F.2d at 1156
> (quoting 19 Charles A. Wright, Arthur R.
> Miller & Edward H. Cooper, Federal Practice &
> Procedure § 4507, at 94-95 (1982)).    In
> predicting a ruling by the South Carolina
> Supreme Court, we may also consider, inter
> alia: restatements of the law, treatises, and
> well considered dicta.  *Id.*

*Private Mortgage Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.*,

296 F.3d 308, 312 (4th Cir. 2002)(footnote omitted).

The parties have not produced a copy of the release Plaintiff

was required to sign in order to receive the enhanced severance.

Plaintiff argues, however, that she should not be forced to

relinquish her right to seek what she believes is full compensation

in order to receive the extra severance.  Defendants contend that

they were justified in implementing the policy and argue that no

law prevents it.  Plaintiff points to no reliable source of

Maryland law to the effect that a waiver or release of the type

28

proposed by Defendants violates any Maryland statute, rule, or
public policy.  Accordingly, summary judgment will be granted in
favor of Defendants on this claim.


**E.    Violation of the WARN Act (Count IV)**

Meson claims she is "entitled to WARN Act payments by virtue
of GATX's untimely notice in an amount equal to 60 days of her
compensation." (Paper 1, ¶ 25).  Defendants contend that Meson is
not covered by the WARN Act because there are fewer than fifty
people who work at the Virginia office where Meson worked.[16]

The WARN Act, 29 U.S.C. § 2101 *et seq.*, requires that
specified employers provide sixty days notice of a plant closing or
mass layoff to affected employees.  The statute defines a "mass
layoff" as a reduction in work force at a "single site of
employment" that affects at least 33% of the employees and a
minimum of fifty employees.  29 U.S.C. § 2101(a)(3)(B).  The
statute does not define "single site of employment."  Instead,
courts rely on the rules promulgated by the Secretary of Labor.
These provisions state in relevant part:

> (i) Single site of employment.
>
> (1) A single site of employment can refer to
> either a single location or a group of
> contiguous locations.  Groups of structures
> which form a campus or industrial park, or
> separate facilities across the street from one

---

[16] The termination letter Meson received expressly refers to
the WARN Act.  (Paper 34, ex. C).

another, may be considered a single site of
employment.

(2) There may be several single sites of
employment within a single building, such as
an office building, if separate employers
conduct activities within such a building.
For example, an office building housing 50
different businesses will contain 50 single
sites of employment.  The offices of each
employer will be its single site of
employment.

(3) Separate buildings or areas which are not
directly connected or in immediate proximity
may be considered a single site of employment
if they are in reasonable geographic
proximity, used for the same purpose, and
share the same staff and equipment.  An
example is an employer who manages a number of
warehouses in an area but who regularly shifts
or rotates the same employees from one
building to another.

(4) Non-contiguous sites in the same
geographic area which do not share the same
staff or operational purpose should not be
considered a single site.  For example,
assembly plants which are located on opposite
sides of a town and which are managed by a
single employer are separate sites if they
employ different workers.

(5) Contiguous buildings owned by the same
employer which have separate management,
produce different products, and have separate
workforces are considered separate single
sites of employment.

(6) For workers whose primary duties require
travel from point to point, who are
outstationed, or whose primary duties involve
work outside any of the employer's regular
employment sites (e.g., railroad workers, bus
drivers, salespersons), the single site of
employment to which they are assigned as their
home base, from which their work is assigned,
or to which they report will be the single

site in which they are covered for WARN
purposes.

20 C.F.R. § 639.3(i). Thus, geographic proximity is the most important criterion, although other factors such as operational, managerial, and labor structures also are relevant to the analysis. *See Viator v. Delchamps Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997)(identifying the relevant factors as "1) the separate facilities are in 'reasonable geographic proximity' of one another; 2) they are 'used for the same purpose'; 3) and they 'share the same staff and equipment'"); *Teamsters Local Union 413 v. Driver's Inc.,* 101 F.3d 1107, 1109-10 (6th Cir. 1996)(identifying geographic proximity as a major factor and operations as an additional factor); *Frymire v. Apex Corp.*, 61 F.3d 757, 766 (10th Cir. 1995)(identifying proximity and contiguity as the most important factors); *Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*, 6 F.3d 722, 726 (11th Cir. 1993)(relying on geography and operations to determine what constitutes a single site of employment).

Meson asserts that although she had a small office in Virginia, she reported to GTS's headquarters in Tampa, Florida, and therefore, GTS's Tampa office was her "single site of employment."[17] (Paper 34, at 15). Meson states in her declaration that during her employment with GTS she:

---

[17] The parties do not say how many employees worked in the Tampa, Florida, office.

> traveled a lot from point to point, both as a
> manager and sales representative, and the
> primary work was done outside of GTS' Virginia
> office.  I reported to Tom McGreal and Paul
> Haire, who were located in GTS' Tampa, Florida
> headquarters, for all matters and received all
> of my guidance from that location as to all of
> my activities.

(Paper 34, Meson decl., ¶ 9).  Relying on 20 C.F.R. § 639.3(i)(6),
Meson states that the single site of employment may be either (1)
the  home base, (2) the place from which the work was assigned, or
(3) the place to which she reports.  Because her work was assigned
from the Tampa office and she reported to two supervisors located
in the Tampa office, the Tampa office was her "single site of
employment."  (Paper 34, at 16).

    Defendants respond that Meson was not only a sales
representative for GTS but also a regional vice president, and as
a result, GTS's Virginia office was her single site of employment.
That office housed only three employees.  (Paper 35, at 22).

    A few courts have considered 20 C.F.R. § 639.3(i)(6), and they
have found that this section is not applicable where the employee
has a fixed or regular work site.  For instance, in *Moore v. On-
Line Software International, Inc.*, No. 92 C 1563, 1993 WL 244902,
at *5 (N.D.Ill. Apr. 13, 1993), the plaintiff was a regional sales
manager with an office in Naperville, Illinois, who claimed that
his site of employment was Fort Lee, New Jersey, where the
corporate office was located.  The plaintiff alleged that his work
was assigned from New Jersey and his supervisor was located in New

Jersey.  *Id*. at *4.  The court stated that the plaintiff did have a regular employment site other than the New Jersey site, specifically, the Naperville, Illinois, site, and that was the location from where he directed and coordinated sales activity. Thus, the  the Naperville, Illinois, site was his "single place of employment."  In *Harbert v. Healthcare Services Group, Inc.*, 391 F.3d 1140, 1152 (10th Cir. 2004), the United States Court of Appeals for the Tenth Circuit held that 20 C.F.R. § 639.3(i)(6) applies only to employees without a fixed place of work.  The Tenth Circuit explained:

> [W]e believe that this provision of the WARN Act governs only employees without a fixed place of work, not employees who, like Plaintiff, do have a fixed place of work.  All three examples listed in the parenthetical in the WARN Act regulation are employees who do not have a fixed place of work. *See* 20 C.F.R. 639.3(i)(6)(listing railroad workers, bus drivers, and salespersons).  Furthermore, the agency, in enacting the WARN Act regulation, referred to § 639.3(i)(6) as "that part of the regulation relating to mobile workers[.]"  54 Fed.Reg. 16042, 16051 (1989).  Finally, for employees who do have a fixed place of work, there is no reason to believe the agency for purposes of the WARN Act would have named any different place as the employee's employment site.  Accordingly, we conclude that the applicable WARN Act regulation, 20 C.F.R. § 639.3(i)(6), applies only to employees without a fixed place of work and is not relevant to employees who, like Plaintiff, do have a fixed place of work.

*Id*. at 1152.  *See also Air Line Pilots Ass'n, Int'l. v. Pan Am. Airways Corp.*, No. Civ. 02-593-M, 2004 WL 32942, at *2 (D.N.H. Jan.

6, 2004)(stating that if an employee has a fixed home base, that is his or her site of employment).

At the very least, geography indicates that an office in Falls Church, Virginia, and another in Tampa, Florida, are not a "single site of employment."  Moreover, Meson does not appear to dispute that GTS's Virginia office was her fixed place of work, although she asserts that she traveled and that her primary work was done outside of this office.  Because of the distance between the Tampa and Virginia offices, and the fact that the Virginia office was her fixed place of work, the Virginia office is Meson's single site of employment for purposes of the WARN Act.  Because the office had fewer than 50 employees, Meson's termination is not covered by the WARN Act.

In the alternative, Meson asserts that her termination letter constituted a promise that, if she stayed on the job as long as she was needed, she would be paid through July 25, 2004.  (Paper 34, at 16).  The letter states: "If you are not needed to assist with transition activities, you will receive your regular salary and employee welfare benefits through July 25, 2004."  (Paper 34, ex. C).  Meson appears to be seeking additional salary and employee welfare benefits above and beyond the severance pay she received, and argues in her opposition memorandum that the letter "was an offer to form a unilateral contract, one that Ms. Meson could and did accept by staying on the job through June 30, 2004."  (Paper 34, at 16-17).  Her complaint, however, does not contain a breach

34

of contract claim based on the termination letter; her complaint only seeks "payments by virtue of GATX's untimely notice." (Paper 34, ¶ 25).

A plaintiff may not amend her complaint through arguments at the summary judgment stage. As the United States Court of Appeals for the Eleventh Circuit has explained:

> In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* Efficiency and judicial economy require that the liberal pleading standards under *Swierkiewicz* and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004); *see also Icee of Am., Inc. v. Mid-American Icee Corp.*, No. 3:02-CV-0364-L, 2005 WL 2415940, at *19 n. 20 (N.D.Tex. Sept. 29, 2005); *Arnold v. Storz*, No. 00-CV-4485 (CBA), 2005 WL 2436207, at *5 (E.D.N.Y. Sept. 30, 2005); *Beckman v. U.S. Postal Serv.*, 79 F.Supp.2d 394, 407-08 (S.D.N.Y. 2000).

Accordingly, Defendants' motion for summary judgment on Count IV as presently pled will be granted.

**IV.  Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment on Count I will be granted in part, the motion for summary judgment on Counts II, III, and IV will be granted.  In addition, Counts V, VI and VII will be dismissed.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge